FILED
IN OPEN COURT

APR 1 2 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:23cr135 |
| | ) | |
| MARIA REICH, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the Counts One and Eight of the Indictment and the following facts are true and correct, and that had the matter gone to trial, the United States would have proven them beyond a reasonable doubt with admissible, credible evidence:

At all times material to this information:

A. Reich and ASOC, Inc.

1. MARIA REICH was President of ASOC, Inc. d/b/a On Call Accountants ("OCA"), a Virginia Beach-based business which offered bookkeeping, accounting, and payroll services to small business clients.

2. Virginia Beach is within the Eastern District of Virginia.

3. Company A is a family-owned company that manufactures condiments and is located in Virginia Beach, Virginia.

4. MARIA REICH and On Call Accountants did the bookkeeping for Company A

5. MARIA REICH would prepare checks and schedule electronic payments on behalf of Company A in order to pay the company's bills.

6. MARIA REICH had personal and business credit cards at Capital One Bank and bank accounts at Navy Federal Credit Union.



B. EIDL Loans

7. In response to the economic crisis caused by the coronavirus pandemic, the Small Business Administration ("SBA") made government-guaranteed loans available to qualified small businesses through the Economic Injury Disaster Loan ("EIDL") program. The purpose of EIDLs was to enable small businesses to meet financial obligations and operating expenses in light of the pandemic. The SBA promulgated regulations concerning eligibility for an EIDL. Eligible businesses seeking an EIDL could apply for such a loan directly through the SBA.

8. To qualify for an EIDL, an applicant had to meet certain criteria, including, among other things, that it was in operation prior to the pandemic, and had regular operating expenses, which would have been paid if not for the pandemic. Moreover, the amount of the loan that could be approved under the EIDL program typically was a function of the applicant's working capital. The proceeds of an EIDL could be used for working capital and normal operating expenses. The proceeds of an EIDL were not permitted to be used to fund the borrower's ordinary day-to-day living expenses or to purchase personal real estate.

9. If qualified, an EIDL loan applicant was also entitled to loan modifications to increase the amount of an original loan.

10. If an EIDL loan or advance is approved, that information is wired from the SBA server in the Eastern District of Virginia to a Treasury Department server located outside of Virginia.

11. EIDL loans were benefits authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. § 5122).

**REICH and Company A**

12. Company A was established in or about 1987 by N.A. and his son, T.A. Following N.A.'s death in or about 1992, T.A. continued to operate the business. Company A experienced significant growth throughout the 2000s. By 2012, its annual sales had grown to approximately $1.8 million. Company A's products are carried by major grocery store chains throughout the Hampton Roads area of Virginia, Northern Virginia, Washington, DC, Maryland, and Delaware.

13. In or about February 2012, Company A hired REICH to maintain the company's books, track accounts payable and receivable, and process payroll. REICH quoted a monthly cost of approximately $1,050 for the standard bookkeeping and payroll services. REICH further advised that she could perform additional tasks as needed, which would increase the monthly cost to $2,050.

14. Beginning in or about February 2012, REICH visited Company A's offices in Virginia Beach approximately once each week. Initially, services rendered by REICH included paying and reconciling vendor accounts, making payments for Company A's business expenses and reimbursements, using the accounting software QuickBooks to record Company A's income and expenses, and processing payroll for Company A's employees.

15. For most of the period during which she performed services for Company A, REICH did not have signature authority over any of the company's financial accounts. REICH did, however, possess a stamp bearing T.A.'s signature which she used to draft checks for Company A's business expenses. REICH also had online access to Company A's financial accounts, which enabled her to view account balances, transfer funds, and initiate electronic payments as needed. Company A was one of only a few client accounts on which REICH

worked almost exclusively. OCA employees occasionally processed payroll for Company A, but none were given access to Company A's financial accounts.

16. By approximately 2014, REICH began to take a more active role in Company A's day-to-day operations. REICH interviewed prospective employees, wired funds to Company A's delivery drivers when the company credit card was declined, and on a few occasions provided small loans when Company A lacked the necessary funds to pay expenses. The amounts never exceeded $5,000 and were always repaid within a matter of days. The loans were informal, lacking promissory notes or other written agreements, and did not carry interest. T.A. did not request the loans, but REICH volunteered them.

17. Company A's cash flow shortages became a recurring problem. REICH attributed the cash shortages to T.A.'s personal spending. In or about March 2016, T.A. deposited over $750,000 of his personal money into Company A's business accounts. Despite the infusion of funds, Company A continued to experience cash flow shortages.

18. In or about 2018, T.A. asked REICH to "watch things" at Company A when he was unavailable and agreed to pay her more for doing so. T.A. regularly communicated with REICH by telephone - sometimes multiple times a day – providing her with directions to be relayed to the Company A employees who oversaw manufacturing and distribution processes and requesting her assistance in handling various personal matters.

19. Starting in or about October 2018, T.A.'s wife worked intermittently at Company A's offices. Although she did not initially have online access to Company A's business bank accounts, his wife was able to review a portion of Company A's financial records, and discovered patterns of suspicious outgoing payments.

20. In a January 9, 2019 email message to T.A., REICH confirmed her payment arrangement with Company A. REICH advised that she charged $2,050 per month when she was "handling everything," and $1,050 per month when she "cut back." REICH further stated, "Any reimbursements for items I paid for or loans I gave Company A have always been recorded in the memo of the checks in QuickBooks, so you can see exactly what it was for." In an apparent reference to Company A employees occasionally using REICH's credit card for Company A-related expenses, REICH stated, "There were times the guys were using my CC too, so I would always put in the memo of check what it was for when reimbursed so it is very easy to track. I have not done any recent loans to company though since [your wife] came on board and I stopped coming to your office so there isn't anything else there to track now."

21. Based on REICH and Company A's agreement, the maximum total compensation she should have received for services rendered to Company A in the 48 months between January 2015 and December 2018 was $98,400.

22. The Federal Bureau of Investigation conducted a complete financial analysis of REICH's activity with Company A's finances during the relevant time period. The analysis revealed that, between January 2015 and December 2018, REICH's OCA business account received 270 payments totaling $596,418 from Company A accounts: 138 checks totaling $229,899 and 132 electronic payments totaling $366,519. REICH was not entitled to the majority of these payments.

23. REICH also used Company A's money to pay off REICH's credit cards, which she used for numerous personal expenses. The financial analysis revealed that between 2015 and 2018, REICH made 366 payments totaling approximately $629,265 were made to REICH's Capital One personal and business credit card accounts using funds from Company A's business

bank accounts, for which she was never authorized to do. REICH used Company A's money to pay for personal expenses such as dining, travel, entertainment, retail purchases, and the like.

24. Many of REICH's payments to Capital One from Company A's bank account were mobile payments made by REICH via the Internet. These mobile payments were transmitted by means of interstate wires into and out of the Eastern District of Virginia. For example:

| Approximate Date of Wire Transfer | Amount paid via interstate wire from Company A's Towne Bank account to REICH's Capital One account |
|---|---|
| November 28, 2018 | $1,038.91 |
| December 4, 2018 | $1,210.28 |
| December 11, 2018 | $1,294.61 |
| December 14, 2018 | $3,561.73 |
| December 19, 2018 | $1,716.83 |
| December 26, 2018 | $1,457.00 |
| December 31, 2018 | $1,551.25 |

25. On or about January 17, 2019, REICH sent an email message to T.A. notifying him that she no longer wished to perform work for Company A.

26. On November 3, 2022, REICH and her counsel met with the Assistant United States Attorney assigned to the investigation as well as the FBI. During that meeting, REICH advised that T.A. had regular access to her Capital One business credit card, and routinely used the card for personal expenses. REICH further advised that she often used her Capital One



business credit card, as well as funds from her financial accounts, to pay Company A-related expenses when the business was experiencing cash flow shortages.

27. REICH provided the government with a 31-page document titled "ON CALL ACCOUNTANTS LOAN to COMPANY A ACCOUNTS." The document reflected details for over 1,000 purchase transactions or payments made between September 2015 and January 2019 using REICH's Capital One business credit card or funds from her financial accounts. REICH claimed that all of the transactions were Company A-related expenses she made when the company was experiencing cash flow shortages or personal purchases made by or for T.A..

28. REICH characterized the payments, in sum, as a "loan" to Company A, suggesting that the payments from Company A's business accounts to her Capital One business credit card were repayment for funds she had "loaned" to the business and T.A..

29. While REICH did make a few purchases on behalf of Company A, the majority of the alleged "loans" were actually payments made for REICH's personal expenses which were paid for with Company A's funds. From in or about January 2015 through January 2019, examples of REICH's payments for personal expenses with Company A's funds include:

  a. Over $6,500 for automotive expenses, including repair and restoration of a 1957 Chevrolet, located at REICH's former residence at 713 23rd Street, Virginia Beach, Virginia (the "23rd Street Residence"), from H&R Motors, Classic Industries Corp., and other vendors;

  b. Over $5,000 of appliances from East Coast Appliance for the 23rd Street Residence, including a dishwasher, refrigerator, microwave, and electric range;

  c. A $3,000 mattress from Sleep Number Corp. for the 23rd Street Residence;



    d. Over $4,200 for tile, bathroom vanities, and a storage shed for the 23rd Street Residence from Wayfair;

    e. Over $1,200 for a pergola, surf boards, and playhouse from Walmart for the 23rd Street Residence from Sam's Club/Walmart;

    f. Over $1,100 in security services from Johns Brothers Security for the 23rd Street Residence;

    g. Over $4,600 for a trip to Jamaica;

    h. Over $1,500 for cleaning services for REICH's home and office locations;

    i. Over $800 for telephone, Internet, and utility services for REICH's home and office;

    j. Over $5,600 in adoption fees;

    k. Approximately 298 purchases from Apple iTunes totaling $11,855;

    l. Over $6,300 in payments to health care providers for REICH and her family; and

    m. Over 60 purchases totaling over $7,000 at various restaurants.

30. As a result of REICH's scheme, she stole approximately $1,132,693 from Company A to which she was not entitled.

**REICH and the EIDL Loan**

31. From in or around April 2021 through in or about August 2021, in the Eastern District of Virginia and elsewhere, the defendant did knowingly, in connection with the COVID-19 relief loan applied for in the name of OCA, devise and participate in a scheme and artifice to defraud a financial institution and the SBA, and to obtain money and property from them by

means of materially false pretenses, representations, and promises, all in violation of title 18, United States Code, Section 1343.

32. In March 2020, REICH applied for an EIDL loan on behalf of OCA and requested a $150,000 loan. In the EIDL application, REICH certified that none of the EIDL funds would be used for non-business expenses.

33. In May 2020, the SBA funded the EIDL loan to REICH and OCA for $150,000. On May 21, 2020, when REICH signed the Loan and Security Agreement, she specifically certified that none of the EIDL funds are or would be for "personal, family, or household expenses."

34. In April 2021, REICH applied for a modification of the EIDL loan, specifically to increase the loan from $150,000 to $500,000. In the EIDL application, REICH certified that none of the EIDL funds would be used for non-business expenses.

35. In July 2021, the SBA approved the modification and funded the EIDL loan to REICH and OCA for an additional $350,000. On July 28, 2021, when REICH signed the Loan and Security Agreement for the modified loan, she specifically certified that none of the EIDL funds are or would be for "personal, family, or household expenses." REICH knew this to be false when she certified the agreement.

36. On August 3, 2021, an interstate wire deposit from the SBA for $350,000 was made to OCA's Truist bank account. REICH immediately transferred $150,000 to her personal Navy Federal Credit Union (NFCU) personal banking accounts.

37. On September 27, 2021, REICH withdrew approximately $93,416 from her NFCU savings account via a check. The money was used for a downpayment for the purchase of

the residence located at 5317 Stratford Case Drive, Virginia Beach, which was used as REICH's family residence. REICH and her family continue to the reside at this residence.

38. REICH would populate the loan applications, sign the agreements and submit them to the lenders and the SBA via the Internet from the Eastern District of Virginia. Each online application, agreement, and certification caused an interstate wire that was foreseeable to REICH, as the SBA servers were located outside of Virginia.

39. In addition to the downpayment for the residence, from the $150,000 REICH transferred to her personal NFCU accounts, REICH used the EIDL funds for the following:

    a. $5,000 into her minor children's bank accounts;

    b. $2,349 to her Kohl's credit card;

    c. $7,194 in mortgage payments on her personal residence; and

    d. $10,883 for personal loan, credit card, and life insurance payments.

40. Of the remaining EIDL funds from the $350,000 EIDL loan, REICH made the following payments for personal, household, and/or family expenses:

    a. $65,009 to her Capital One credit card;

    b. $21,837 to her PayPal account;

    c. $14,378 in home improvement costs;

    d. $13,224 in automobile expenses;

    e. $8,004 in dining and grocery expenses; and

    f. $7,808 in entertainment expenses.

41. As a result of the aforesaid scheme and artifice, REICH received and spent EIDL funds to which she was not entitled in the approximate amount of $249,102.



42.     The defendant's participation in the events described was undertaken knowingly, intentionally, and unlawfully, and not as a result of an accident, mistake, or other innocent reason.

43.     The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case, nor does it identify all of the persons with whom the defendant may have engaged in illegal activities.

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
Elizabeth M. Yusi
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, MARIA REICH, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

*Maria Reich*
MARIA REICH

I am MARIA REICH's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

Kirsten R. Kmet, Esq.
Counsel for Defendant